**MENARD, INC., Appellant–Defendant,**

**v.**

**Mary COMSTOCK, as Personal Representative of the Estate of C.J. Comstock, Deceased, Appellee–Plaintiff.**

No. 45A04–0905–CV–263.

Court of Appeals of Indiana.

Feb. 25, 2010.

Bruce P. Clark, Jennifer E. Davis, Bruce P. Clark & Associates, Munster, IN, Attorneys for Appellant.

Rhett L. Tauber, Jack A. Kramer, Tara K. Tauber, Tauber Westland & Bennett P.C., Schererville, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Menard, Inc. ("Menard"), appeals the trial court's decision to grant the motion to correct error filed by Mary Comstock, as personal representative of the estate of C.J. Comstock, and to amend the amount of damages awarded to Mary. We reverse and reinstate the jury verdict.

### Issue

Did the trial court abuse its discretion by granting Comstock's motion to correct error and amending the amount of the damages award?

### Facts and Procedural History

On or about December 13, 2003, sixty-year-old C.J. Comstock and his wife, Mary, were walking toward the building materials entrance of a Menards[1] store in Hammond when C.J. slipped and fell on snow and/or ice on the sidewalk. Mary was able to help C.J. into a sitting position, and an unidentified man assisted her in getting C.J. to his feet. Mary helped C.J. back to their vehicle in the Menards parking lot and then returned to the store to report the incident and purchase the space heater they had intended to buy that day.

Upon learning of the incident, Menards store manager Marlon Gary went to the Comstocks' car to assess C.J.'s condition. Gary offered to call an ambulance, and C.J. replied that he had a headache but did not want to go to the hospital. Mary drove him home, where C.J. continued to complain of a headache. The next day, he said that it had developed into the "worse [sic] headache he'd ever had." Tr. at 735. He was nauseated and had trouble concentrating, but he refused Mary's offer to take him to the hospital. Two days after the fall, on December 15, 2003, C.J. slid off the edge of the bed onto the floor. Mary called the fire department, apparently to assist her in getting him back onto the bed. When the emergency team arrived, they found C.J. unresponsive. They took him to the hospital, where he was diagnosed with a cerebral contusion and hemorrhage. He later died from his injuries.

On or about December 9, 2005, Mary filed her complaint for wrongful death against Menard. The complaint alleged

---

1. Menard operates its stores under the name Menards.

that "as a direct and proximate result of the negligence of [Menard] and/or its agents, C.J. Comstock, slipped and fell on the ice and/or snow, thereby suffering severe injuries including those to his head, which injuries caused the death of C.J. Comstock." Appellant's App. at 33.

At trial, neurologist Dr. Larry Salberg testified that C.J.'s complaints of headaches and nausea after the fall were signs of increasing intracranial pressure. He stated that if C.J. had gone to the hospital on December 13 or 14, 2003, doctors likely would have identified and treated the brain bleed, and C.J. would have survived. At the time of his fall, C.J. was taking the prescription drug Coumadin, a blood thinner, to treat a genetic problem that caused blood clots in his legs. Dr. Salberg testified that Coumadin increases the risk of brain bleeds following bumps on the head or even coughs and sneezes. He stated that C.J. was a "fall risk," meaning that he was less steady on his feet than the average person because of various health issues and medications he was taking at the time of the incident. *Id.* at 1075.

At trial, Mary presented evidence of damages incurred by C.J.'s estate because of the fall and his death. She showed that C.J. had incurred $8212.99 in medical expenses and $4664.04 in funeral/burial expenses. Also, Mary testified that C.J. had been receiving social security disability income at the time of his death in the amount of $2208.00 per month. The trial court, without objection, took judicial notice that C.J.'s additional life expectancy was 18.7 years.

The jury returned a gross verdict of $24,638.97 in favor of Mary. The jury also allocated fault among the parties, with 35% attributed to C.J., 35% attributed to Mary, and 30% to Menard. After application of Menard's fault allocation, the jury awarded 30% of the total verdict, or $8212.99, to

Mary. On March 23, 2009, Mary filed a motion to correct error and memorandum in support thereof. On April 10, 2009, Menard filed its statement in opposition to the motion. On April 13, 2009, Mary filed a reply. On April 16, 2009, the trial court granted Mary's motion to correct error and amended the damages award to $149,240.71. This appeal ensued.

## Discussion and Decision

■ In her motion to correct error, Mary argued that because "all damages directly attributable to the wrong are recoverable" by the victim, the jury's verdict did not comport with the evidence presented. Appellant's App. at 53; *see Childress v. Buckler,* 779 N.E.2d 546, 551 (Ind.Ct. App.2002). She claims that the jury found Menard 30% at fault for C.J.'s death and that because she presented evidence of "undisputed economic losses" totaling $507,469.03, the verdict should have been $152,240.71. Menard argues that the trial court erred by granting Mary's motion to correct error and modifying the jury's verdict. It says that the jury assigned fault to Menard for C.J.'s fall but not his death and that therefore, the jury's damages award was supported by the evidence.

■ The trial court granted Menard's motion to correct error pursuant to Indiana Trial Rule 59(J), which states in pertinent part:

The court, if it determines that prejudicial or harmful error has been committed, shall take such action as will cure the error, including without limitation the following with respect to all or some of the parties and all or some of the errors:

. . .

(5) In the case of excessive or inadequate damages, enter final judgment on the evidence for the amount of the proper damages, grant a new trial, or

grant a new trial subject to additur or remittitur[.]

This remedy is available only when the evidence is insufficient to support the verdict as a matter of law. *Childress,* 779 N.E.2d at 550. Trial courts must afford juries great latitude in making damage awards determinations. *Id.* A verdict must be upheld if the award falls within the bounds of the evidence. *Id.* A trial court may reverse a jury's award determination only "when it is apparent from a review of the evidence that the amount of damages awarded by the jury is so small or so great as to clearly indicate that the jury was motivated by prejudice, passion, partiality, corruption or that it considered an improper element." *Dee v. Becker,* 636 N.E.2d 176, 177 (Ind.Ct.App.1994).

■ Once the trial court has entered final judgment on the evidence for the amount of proper damages, we will reverse this decision only for an abuse of discretion. *Solnosky v. Goodwell,* 892 N.E.2d 174, 184 (Ind.Ct.App.2008). An abuse of discretion occurs when the trial court's action is against the logic and effect of the facts and circumstances before it. *Id.* In determining whether the trial court abused its discretion, we must only consider the evidence and reasonable inferences favorable to the non-moving party. *Id.* We may not weigh conflicting evidence or judge the credibility of witnesses. *Id.*

While the case was pled as a wrongful death claim, the jury also heard evidence and arguments for a survival claim. For example, Dr. Salberg testified that if not for C.J.'s delay in seeking medical treatment, he would likely have lived. Also, in his closing argument, Menard's attorney argued in part:

[I]f [C.J.] sustained a bump on his head and you thought that [Menard was] negligent and caused that slip and fall, then whatever injuries he would have had just from that bump, you may be able to award damages. But if you don't think that that was—the actions that occurred on Saturday night, Sunday and Monday were foreseeable, that was something [that] would reasonably be anticipated, that somebody would not take care of themselves or the spouse would not react and do something, then that is not—the original act by [Menard] is not the proximate cause. The proximate cause of the death is the unforeseen acts of Mr. and/or Mrs. Comstock. And that's what's important.

Tr. at 1431–32.

Indiana Trial Rule 15(B) permits the amendment of pleadings to include the issues tried and states in pertinent part:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they have been raised in the pleadings. Such amendment of the pleadings may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment, but failure to so amend does not affect the result of the trial of those issues.

Clearly, the theory that Menard might have been negligent in causing C.J.'s fall, but not his death, was before the jury in this case. According to Rule 15(B), the pleadings' contents do not override the fact that an issue has been tried by express or implied consent of the parties. In this case, a survival claim was tried, and the fact that the pleadings were not amended to include that claim does not nullify it.

The gist of Mary's motion to correct error was that the jury had only two options in this case: (1) to assign Menard zero fault for C.J.'s death and thus to award Mary zero damages, or (2) to assign

Menard a percentage of fault for C.J.'s death and to award Mary that percentage of *at least* $507,469.03, which is the total amount of monetary damages she claimed to have suffered.[2] In our view, the jury chose a third viable option, which was to find Menard's partially liable for C.J.'s fall, but not for his death. The amount of the jury's verdict indicates that it applied the survival theory and awarded damages within the scope of the evidence—namely, the cost of C.J.'s medical bills plus other damages related to C.J.'s injuries, such as, perhaps, Mary's loss of consortium during the days she took care of him following the accident. The total award of $24,638.97 was within the evidence, and thus the trial court erred in overturning it.

Based on the foregoing, we conclude that the evidence is sufficient to support the jury's verdict as a matter of law and that the trial court erred in reversing that verdict pursuant to Trial Rule 59(J)(5). Therefore, we reverse the trial court's order granting Mary's motion to correct error and remand for reinstatement of the jury's verdict awarding damages to Mary in the net amount of $8212.99.

Reversed and remanded for proceedings consistent with this opinion.

VAIDIK, J., concurs.

RILEY, J., dissents with separate opinion.

RILEY, Judge, dissenting with separate opinion.

I respectfully dissent from the majority's opinion reversing the trial court's order which granted Mary's motion to correct error and amended the jury's damages award.

On December 9, 2005, Mary initiated this action by filing a Complaint for Wrongful Death. During the trial, Mary presented uncontroverted evidence of damages incurred by C.J.'s estate or by her as a result of C.J.'s death. Specifically, she presented evidence of medical expenses, funeral expenses, and C.J.'s social security disability income. Although the majority now focuses its decision on the fact that a survival claim was tried by implied consent of the parties, the jury was not instructed on any causes of action other than wrongful death. Nevertheless, based upon this survival claim, the majority opines that the jury could reasonably find Menard's partially liable for C.J.'s fall but not his death. As such, the majority determined the total jury award of $24,638.97 to be within the evidence presented.

However, Indiana Trial Rule 59(J) gives a trial court the discretion to amend a jury award in the case of inadequate damages. The trial court, finding that the jury had erred in its award by failing to calculate C.J.'s lost income, increased the jury award to $149,240.71. I cannot conclude that the trial court abused its discretion as Mary clearly proceeded under a wrongful death claim, presented uncontroverted evidence of C.J.'s lost income, and the jury was instructed as to the wrongful death claim—not the survival claim.

2.  In fact, Mary's counsel asked the jury to return a verdict for Mary in the amount of 3.5 million dollars to compensate her also for the loss of C.J.'s love and companionship.